The next case on the docket this morning is number 517-0471, People v. McKinney. Arguing for the appellant, Keith McKinney, is Jennifer Lassie. Arguing for the appellee, People of the State of Illinois, is Jennifer Camden. Each side will have up to 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. You'll see the digital timekeeping device on my screen. I'll bang the gavel when time has expired. Please remember, only the clerk is permitted to record these proceedings today. Good morning. Welcome back, Ms. Camden. Ms. Lassie, are you ready to begin? Yes, Your Honor. All right. Proceed, please. May it please the Court, Counsel. My name is Jennifer Lassie with the Office of the State Appellate Defender, and I represent a defendant appellant, Mr. Keith McKinney. Due to time constraints, I would like to focus on Argument 1, the ineffective assistance of counsel claim, and if time permits, Argument 2, the Rule 431B error. Trial counsel was ineffective in this case, where he promised the jury that Mr. McKinney would testify and that jurors would hear evidence that it was impossible for the bullet in Gilmore's vest to have been fired from the gun in Mr. McKinney's yard. Counsel's opening statement suggested that Gilmore shot and framed Mr. McKinney because the two were neighbors and because Gilmore had issues with Mr. McKinney. During his opening statement, counsel told jurors that the gun that Gilmore claimed Mr. McKinney threw could not have shot the bullet in Gilmore's vest, specifically telling jurors, You're going to hear that the bullet that was taken out of that bulletproof vest was too big to have come from the .22 that they're saying that Skinney had. Couldn't have shot him. Counsel also told jurors that Mr. McKinney would testify, telling them, Skinney is going to tell you he wasn't wearing any gloves. He wasn't. He had no reason to. He was driving home from the doctor. He didn't plan on any of this. Now, the ballistics evidence that counsel promised and never delivered was a critical issue in the defense's theory of the case that Gilmore had framed Mr. McKinney. And for counsel to make this promise at the beginning of the case created heightened expectations in jurors. And when counsel failed to deliver, he lost all credibility. Counsel's failure to deliver this promised evidence left counsel floundering about in closing argument where counsel argued that Gilmore shot and framed Mr. McKinney or alternatively that Gilmore was actually shot by someone else and assumed it was Mr. McKinney. Now, the state attempts to downplay counsel's promise that Mr. McKinney would testify as simply a promise that Mr. McKinney would tell jurors he was not wearing gloves. However, reasonable jurors would not expect Mr. McKinney to take the stand to make a single statement that he was wearing gloves. Counsel's promise would lead reasonable jurors to believe that Mr. McKinney would take the stand and tell his side of the story, that he wasn't wearing gloves, that he had just gone to the doctor,  Now, not only did counsel tell jurors that Mr. McKinney would testify during opening statements, but counsel reminded jurors about Mr. McKinney's failure to testify during closing arguments. And then counsel compared Mr. McKinney's failure to testify with Gilmore's refusal to speak to police, something counsel characterized as a little bit fishy and cause for concern. Now, in Briona's, this court held that where defense counsel makes promises like these, these broad dramatic promises of exculpatory evidence, counsel has a duty to put evidence into the record explaining his failure to fulfill the dramatic promises he made in opening. And that was Briona's cited in the briefs. Counsel's failure to do so here is unreasonable. And these errors by counsel mattered. Mr. McKinney was prejudiced by counsel's mistake because the evidence here was not overwhelming. Jurors might have concluded that Gilmore had actually framed Mr. McKinney where there was evidence to support that defense theory. When conducting the traffic stop, Gilmore did not activate his lights, sirens, or audio video camera. At first he claimed his memory card was full, but then he also claimed the camera equipment was junk. However, Officer Sapp's camera equipment seemed to work just fine, as evidenced by the video exhibit in the record. Now, Gilmore was Mr. McKinney's neighbor. Another neighbor who lived next door to Mr. McKinney said that Officer Gilmore would stand at his back door and stare at Mr. McKinney's house four or five times per week. Bird felt uneasy about the situation, and she called it a very unhealthy situation. Now, Keith Larson, another neighbor, he observed the traffic stop as it began. He testified, I believe, that when he saw Gilmore following Mr. McKinney down the street as the traffic stop was beginning, he knew it wasn't going to be good. However, he saw Mr. McKinney complying with Gilmore at the beginning. He saw Mr. McKinney handing Gilmore papers at the beginning of the traffic stop. And at that point, Keith Larson walks away from where he's able to view the traffic stop, and then he hears gunshots. Now, Keith Larson did initially testify that he saw Mr. McKinney shooting. However, on cross-examination, he admitted that he saw Mr. McKinney pointing and that Gilmore was blocking his view and that he could not tell what, and I quote, if anything, Mr. McKinney was holding. And if you look at the exhibit, I believe it's People's Exhibit 5 in the record, it's an aerial view of the street, and it shows Keith Larson's home compared to Keith McKinney's home. And if you see that aerial view and realize where Gilmore's truck was parked, it makes sense that Keith Larson's testimony makes sense where he says Gilmore was blocking his view. It's unclear how much, if anything, from these exhibits that Keith Larson could actually see based on where his home is located, where Gilmore's truck was parked, and where Keith McKinney's house is at. So the evidence here was not overwhelming. SAP arrived on scene and told Officer Gilmore to sit in his truck, and it was after that when Gilmore goes to his truck, comes back, and then claims to have found the gun on the ground. SAP did not see the gun before Gilmore picked it up. Gilmore claimed he was shot. SAP saw his chest, bare-chested, but did not see any visible injuries. When state police requested to interview Officer Gilmore, he spoke with his union lawyer instead and filed an amended report. No prints of Mr. McKinney's were – there was no evidence that Mr. McKinney's prints were on the gun. Well, isn't it true that they didn't even try to find prints on the gun? I don't know. I don't recall from the record whether they tried, but there was no evidence. But his prints could have been on there. So you said they didn't find prints on his gun. Well, they didn't even try to find prints. Isn't that correct? So I do not recall whether they tried to find them or not off the top of my head, but there was no testimony that his prints were on the gun, I guess. So his prints could have been on the gun. That's what I'm trying to say. Sure, they could have been. Okay, but that's not what you said. Okay, let's go ahead. Yeah, I could have probably stated that a little better. Yeah, I just simply meant, you know, there was no evidence of prints on the gun presented at trial. So the evidence here was not overwhelming against Mr. Kinney. And so counsel's dramatic promises that he made in opening that Mr. McKinney would testify and that ballistics evidence would prove that that gun in Mr. McKinney's yard could not have shot that bullet in Gilmore's vest, these were dramatic promises. And they heightened the expectations of jurors. Well, isn't it a fact that the shell casings showed that there was a .22 Magnum, is that correct? Which is bigger than a .22, I would think. Well, so there was some evidence that there was some other bullets, but counsel's promise was that the bullet in Gilmore's vest could not have been shot by the gun that they're claiming McKinney had. Who testified to that? So no one testified to that. So in opening statement, counsel promised that the jury would hear that evidence. He promised the jurors, you'll hear that that gun couldn't have shot Gilmore, that that bullet that they took out of Gilmore's vest couldn't have been fired from that gun. And no one, no evidence was ever presented on that. No testimony, no evidence was ever presented to establish, to fulfill counsel's promise about that. And that would be exculpatory evidence that would almost demand an acquittal. If Gilmore's claiming that this is the gun Mr. McKinney used to shoot him, and ballistics evidence would establish that there's no possible way that gun could have done this act, jurors would almost have to acquit Mr. McKinney. So this was a dramatic promise for counsel to make and then break to the jurors. Ms. Lassie, we're bound to consider this under the Strickland case, right? So we haven't defined that the evidence would be closely balanced. So I don't, so technically, I don't, I think closely balanced is the requirement whenever we are asserting a plain error argument. And I don't think it's necessarily required for ineffective assistance. My time is up, but if I could answer that. Yes, please. So in People v. Bryant, this court found that there was sufficient evidence to find Bryant guilty. However, because counsel had made such a dramatic promise and opening and failed to deliver, this court held that counsel's failure to fulfill his promise made an opening, did prejudice the defendant in People v. Bryant. And this court reversed and remanded in spite of there being sufficient evidence to convict. Okay, thank you very much. You'll have a few moments after Ms. Camden. Ms. Camden, would you like to proceed? Yes, thank you, Your Honor. Excuse me. Jennifer Camden on behalf of the People. May it please the court, counsel. The defendant raises two claims of ineffective assistance based on unfulfilled promises in opening statement. Now, the state argues that there are several reasons why the defendant hasn't met his burden of showing either prejudice or deficient performance as to either claim. The performance arguments overlap somewhat, so I'd like to address them together. The defendant's first claim, based on the defendant's failure to testify, the defendant can't show deficient performance as to that claim because the record doesn't explain what happened. The record doesn't explain why the defendant didn't testify after counsel said that he would. The defendant in reply suggests that there is a record as to what happened, that counsel advised him not to testify. That comes from the colloquy between the court and the defendant personally after the defendant rested when the defendant affirmed that on advice of counsel he was electing not to testify. The state's response to that is that that still doesn't show what happened or deficient performance. Maybe counsel advised the defendant not to testify after the state rested based on unknown changed circumstances. Maybe the defendant personally changed his mind about testifying and sought the advice of counsel about that decision. On these similar facts, in the Manning case, the appellate court found that either could have occurred and that either could reflect reasonable performance, and the court in that case declined to presume deficient performance based on the silence in the record. Now, the state in this case is arguing that this court should follow the Manning analysis. The defendant argues that the court should follow this court's analysis in the Briones case in which this court held that it was counsel's burden to make a record as to what happened and presumed that performance was deficient from the silence in the record and declined to follow Manning. The state would argue that the Manning analysis is the better one. It's consistent with the general principles applicable on appeal, that silence in the record is resolved against the appellant, and that it's his burden on appeal to show that error occurred and that defense counsel's performance is presumed reasonable. I'd also note that the Briones decision, respectfully, on that point stands alone as to whether there's some duty on the part of defense counsel to fill in the gap and that any failure to do so will be presumed to be ineffective performance. The appellate court, subsequent to both cases, in the Winkfield and Talbert cases, cite Manning in Winkfield, declined to follow Briones in the Talbert case, and in both cases refused to presume deficient performance from silence in the record. So for this reason, that's the better analysis. I'd also point out that with regard to that- Ms. Camden, when you talk about silence in the record, you're limiting it to why the defendant didn't testify. Right. Actually, Your Honor, with regard to the second ineffective assistance of counsel argument regarding the ballistic evidence, there's also silence in the record  Is that what Your Honor was referring to? Well, what I wanted to ask you was, in his opening statement, he makes promises that are pretty significant promises when you're talking about proof, and then the silence could almost work against him because there is no explanation, the jury anyway, as to why he didn't present it. Yes, Your Honor. Well, again, in the Talbert and Winkfield cases, the silence in the record was not presumed against counsel there, and the appellate courts in those cases did continue to hold the defendant on appeal to his burden of affirmatively showing deficient performance. I'd note that in cases such as Gordon and the Bryant case, the record was not silent as to what happened. In the Bryant case in particular, there was a post-trial hearing at which counsel explained his own sound strategy. So the appellate court had a record from which to judge the performance. And I'd further note that although the promise, particularly of the ballistic evidence, the state did concede in the brief that that was exculpatory evidence, that was evidence that would tend to exculpate the defendant. However, that doesn't mean that... However, even in those cases, Winkfield and Talbert, the promised evidence in those cases was exculpatory too. And the appellate court in those cases still followed the Manning case, declined to follow Brionis, and refused to presume deficient performance. Also, even where exculpatory evidence is promised, that promise won't be seen as prejudicial, and this is moving from the performance prong to the prejudice prong, if the evidence was overwhelming as here it was. Now, I'd actually like to make one other point about performance. The defense counsel's performance has to be full and the overall question is whether he failed to conduct meaningful adversarial testing. The rule being that from Bryant, that where an unfulfilled promise leaves the defendant with no theory supported by the defense, there was no meaningful adversarial testing and therefore deficient performance. But that's not what happened here. The defendant did present a theory that Gilmour was lying. He presented the testimony of Byrd in support of that and presented the cross-examination of Gilmour in support of that. The counsel, in this case, didn't ask the jury to believe anything in closing argument that he had not supported. Thus, there was no deficient performance under Wingfield. And I note that in the reply brief at page 11, the defendant argues that the evidence was not overwhelming, made in the context of arguing prejudice, and argues that the defense presented a plausible theory that Gilmour framed him. The state's response to that is that if the defendant is conceiving that counsel presented a plausible defense theory, then counsel's performance was not constitutionally deficient. Ms. Camden, let me switch gears on you just briefly. The state has conceded error as to the sentencing on Rule 604 or 605A. Your Honor, the state conceded error as to admonition.  Yes, Your Honor. But could you address that? You still don't believe, although there was error, that we should remand for sentencing admonitions? Correct, Your Honor. The state in the answer brief cited the cases following the Illinois Supreme Court's decision in the Henderson case, in which the appellate court has begun using that case to hold that where a defendant raises sentencing issues on appeal, the appellate court can consider them on the merits instead of remanding for Rule 605 compliance. A Rule 605 admonition error requires remand if there's prejudice or denial of real justice, and there's no prejudice where the defendant can raise and does raise all of his sentencing errors based on the record that does exist, and the appellate court has the discretion to consider them on the merits. The state has the ability to forfeit its forfeiture argument based on failure to raise those claims in a post-sentencing motion, and the state can and does forfeit that here. So the state's not arguing here that the claims raised in Issue 4 are forfeited for failure to raise them in a post-sentencing motion, and the state argues those on the merits and argues that this court has the discretion to consider and deny them on the merits. Okay, thank you. You're very welcome, Your Honor. Your Honor, I'll move back to the issue of prejudice regarding the ineffective assistance claims, unless the court has further questions on the sentencing issue. And what I'd like to say about the prejudice analysis is that in this case, the evidence was, in fact, overwhelming where Gilmore testified that he felt and heard the defendant shoot him and then saw the defendant point a gun at him and shoot again, and where the neighbor, Larson, testified that he heard the first shot, saw the defendant and Gilmore engaged in what he described as a shootout with the defendant clearly in a shooting stance and quite obviously pointing a gun. I note that the testimony of Gilmore and Larson was corroborated by police dispatch audio and the physical evidence found at the scene, namely the .22 caliber Derringer found in the defendant's yard with two fired casings in it, consistent with the testimony of Gilmore and Larson. Although the defendant notes that Sapp didn't testify that he saw the gun before it was picked up, I'd note that it was concealed in a brown leather case and that Sapp did see Gilmore pick it up and the squad car video of Sapp shows this occurring. I see that my time has expired. Yes, Ms. Camden, I have one other question for you, though. It relates to the issue on 431, Rule 431. Yes, Your Honor. These are the admonishments to the jurors. Yes, Your Honor. The state concedes that this was error, too, by the trial court. Yes, Your Honor. But in that regard, you're asking us to consider forfeiture. Yes, Your Honor. Where this occurs, the standard is first-pronged plain error, and that gets to Your Honor's question about the evidence being closely balanced, and that is a different question than the question of prejudice with regard to the ineffective assistance of counsel claim. The question of whether the evidence was closely balanced depends on such things as whether the jurors were asked to determine the relative credibility of witnesses, here they were not, or asked to decide between two equally credible versions of events, here they were not. So for that reason, the state's arguing that the defendant hasn't shown first-pronged plain error as to Issue 2. Okay. Thank you. Ms. Lassie? Ms. Lassie? You have to take yourself off mute. Thank you. Sorry about that. First, the state is urging this court to adopt the approach in Manning, and the state also discussed Talbert and Wingfield. Manning, Talbert, and Wingfield are all first district cases, and this court has already rejected the approach in Manning in Briones. This court in Briones at page 919 said, we agree with Manning that if the defendant, contrary to defense counsel's previous assertion, decided not to testify at the trial, his counsel's performance was not deficient. However, we decline to presume that defense counsel's decision not to present the defendant's testimony after promising to do so in opening statements was the result of trial strategy. So in Manning, or in Briones, this court specifically rejected the Manning approach, and there's no reason to depart from that precedent here. And again, here, it's not just a promise to testify. It's a promise of exculpatory ballistics evidence, and while the state agrees that it's exculpatory, this evidence, if it existed, would demand an acquittal. I mean, it would almost, you know, it lends great support to counsel's argument that Gilmore was framing Mr. McKinney. If that bullet in that vest, if there's no way that could have come out of that gun, I mean, it would almost demand an acquittal. So it's not just a promise to testify like in Briones. This is much worse, the promises made here. With respect to the state's argument about page 11, as appellate counsel, I'm in no way conceding that trial counsel did a good job in presenting his theory. The statement on page 11 that the state was referring to was simply that the evidence here was not overwhelming, so counsel's error here mattered. The evidence here was not so overwhelming as to prevent the jury from finding defense counsel's theory plausible, and that's why this serious error had a serious impact on the outcome of the case. With respect to the state's claims regarding Keith Larson's testimony about it being the shootout, again, initially, Keith Larson did say that he saw Mr. McKinney shooting. However, on cross-examination, he admitted he did not see a gun in Mr. McKinney's hand and only saw him pointing, and he admitted- Isn't it true, though, that they're talking about a derringer? Isn't that a very small gun? There's a lot of evidence that he even fit it in a holster that looked like a wallet. Is that not correct? So could you see the gun if you could see his hand? Well, you would think that he would admit to, or I'm sorry, so it is a small gun, and it is inside a brown wallet, which you would think would make it even more visible, inside that brown, you know- You don't shoot with it in the holster, which is the brown wallet, but I would think that it's very small. It probably fit in your hand, and you couldn't see it. Well, Your Honor, that's a good point. If it was not shot within the holster, somehow it got back into the holster to be photographed by police, because when it was photographed on the ground, it was photographed inside the holster before police removed it from the holster. So when you view the exhibits, you'll see a picture of it inside the holster, and I believe that's how police photographed it before removing it, and before, you know, after Gilmore picks it up and drops it, then it was photographed. I thought he didn't drop it. I thought you said he had to throw it, because it wasn't that close to where they were, allegedly, the shooting took place. Is that not correct? Well, Gilmore does, at one point, Gilmore does claim that he saw Mr. McKinney throw it. However, when it's recovered on the ground, I believe the testimony shows that it was photographed inside the wallet. I know that, but the question is, where was it when it was found? Some distance from where the alleged shooting took place. Is that not correct? It's in a very small front yard. So the shooting takes place in this very, very small front yard, which I believe you can see in a few of the exhibits. It shows it's a very small front yard, and the shooting takes place in one part of that small front yard, and the gun is found, I guess, a few feet away. Is there any testimony as to how far away that would have been? Off the top of my head, I do not recall how far it was in distance, but I do know that States Exhibit 6 in the record shows that it is an incredibly small front yard. I could guess, but I would hate to do that. I think the record does talk about it, but off the top of my head, I just can't remember the distance. But you can see Gilmore's truck, and you can see Mr. McKinney's vehicle, and you can see that the yard is about the size of a vehicle, it appears. So it's a very small front yard. And another point is, Gilmore claims he saw Mr. McKinney throw the gun at trial, but he also admits that he omitted that from all of his amended reports that he filed. I believe I'm out of time, so unless your honors had any more questions, we would respectfully request that you reverse and remand for a new trial as requested in Arguments 1 and 2, or that you grant the sentencing relief in Arguments 3 and 4. All right. Thank you all for your arguments this morning. The matter will be taken under advisement and will issue an order in due course. That concludes the proceedings in People v. Keith McKinney. Thank you.